Filed 2/16/23  In re Z.R. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re Z.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  V.B.,  Defendant and Appellant. | E079758  (Super.Ct.Nos. J288666 &  J288667)  OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Gary E. Beeks for Defendant and Appellant.

Tom Bunton, County Counsel, and Kaleigh Ragon, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court terminated defendant and appellant, V.B.'s (mother), parental rights as to Z.R. (born Sept. 2011) and D.R. (born Feb. 2010) (collectively the children).[1] On appeal, mother contends the court erred in declining to apply the beneficial parental relationship exception to termination of her parental rights. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 9, 2021, the social worker received an emergency response referral reflecting that mother had learned that C.M. (the boyfriend) had sexually abused Z.R. Z.R. reported at least three incidents of molestation by the boyfriend including sodomy, compelling her to rub his private parts with her feet, and placing his private parts on hers. Mother brought Z.R. to the hospital. Mother then packed up her belongings and moved the family out of the home into a friend's residence.

On March 16, 2021, mother went to the police station requesting that the charges of sexual abuse against the boyfriend be dropped. Mother had moved back into the home; she reported that the boyfriend no longer lived there. Mother confirmed with the social worker that she had attempted to have the charges dropped. She said that she and the boyfriend were expecting a baby in August 2021, and she expected him to be in the baby's life.

The social worker informed mother she would need to participate in a safety plan to keep the children safe; mother would have to ensure that the children would participate in medical evaluations and interviews, she would have to enroll the children in

---

[1] The court also terminated E.R.'s (father) parental rights. Father is not a party to the appeal.

counseling, and mother would have to keep the boyfriend away from the children. Mother stated she understood. Mother said she believed Z.R.'s allegations. D.R. denied any abuse.

Z.R. reported that one time, the boyfriend told mother that he was taking Z.R. to a father-daughter dance but, instead, took her to a hotel room, where he told her to take her clothes off "'and did bad stuff'" to her. Z.R. said she felt safe with mother but not with the boyfriend. The social worker provided a safety plan to mother.

On March 18, 2021, the social worker attempted an unannounced visit to the home; a male voice responded. No one would open the door, despite several knocks on the door and window. The social worker's calls and texts to mother went unanswered. The police attempted to conduct a welfare check on March 19, 2021; no one answered the door. The social worker attempted to conduct a visit on March 21, 2021; no one answered the door despite there being two cars in the driveway.

After the social worker obtained a detention warrant, she and an officer attempted to serve it on March 23, 2021; no one answered the door despite mother's vehicle being parked in the driveway. On March 24, 2021, the officer and social worker again attempted to serve the warrant to no avail.

The social worker opined that "mother has no plan to cooperate with [the department] or [police] regarding the reports of sexual abuse of [the] nine-year-old daughter. The mother appears to have allowed [the boyfriend] back into the home and he has had unlimited access to the children, placing them at risk of sexual abuse, harm and/or neglect."

3

On March 29, 2021, personnel from plaintiff and respondent, the San Bernardino County Department of Children and Family Services (the department), filed Welfare and Institutions Code section 300[2] juvenile dependency petitions as to both children alleging, in pertinent part, that mother failed to protect Z.R. from sexual abuse (b-1); that while in mother's care, Z.R. was sexually abused on more than one occasion (d-2); and, as to D.R., that a sibling, Z.R., had been abused and neglected (b-1). On March 30, 2021, the court detained the children.

In the jurisdiction and disposition report filed April 15, 2021, the social worker recommended the court find the allegations true, sustain the petitions, remove the children, and decline to provide mother reunification services pursuant to section 361.5, subdivision (b)(6) (severe sexual abuse). The children had been placed in the home of the maternal great aunt (I.C.) and uncle.

Personnel from the Children's Assessment Center of San Bernardino conducted a forensic interview of Z.R., during which she disclosed numerous incidents of abuse. She said that every time mother would leave the house, the boyfriend would make her take her clothes off; he would make her rub her feet on his "'middle part.'" Every day when he came home, he would bring her into his car where he would have her rub his "'middle part'" with her feet. Mother would provide the Vaseline, but did not know of the abuse. The boyfriend took pictures of Z.R.'s feet. During the father-daughter dance, they stayed

---

[2] All further statutory references are to the Welfare and Institutions Code.

4

overnight in a hotel. "'He would do it all day, until it was morning.'" One time he rubbed "'his middle parts on my privates.'"

After she told mother about the abuse, mother left the home. However, mother later told her they were going back to the boyfriend, "but that he needed to listen to her rules." Z.R. said she felt scared because she was afraid the boyfriend would not listen. Z.R. said the boyfriend would drink, make fun of D.R, and "'would always choke my brother.'" She said the boyfriend hit D.R., which made him bleed all over his mouth, and he hit D.R. with a belt. Mother did not want to leave because she was pregnant. The boyfriend hit Z.R., making her feel dizzy. He pulled her hair and also hit mother.

During the forensic interview of D.R., he reported that when mother left to run errands, the boyfriend would pull Z.R. into a room, lock the door, and force her to do something. He would hear Z.R. crying. D.R. said he witnessed the boyfriend sexually abuse Z.R. in the car. The boyfriend would hit D.R. with a belt, causing bruising. He would "'choke [D.R.] [and] whenever [the boyfriend] gets drunk, he just wants to hit everyone,'" including mother.

Mother said she took Z.R. to the hospital the day after Z.R. disclosed the abuse, but that hospital staff did not find any trauma. Mother said she took the children to Los Angeles for two weeks after receiving the safety plan and was not at the home. She said her attempt to drop the charges was "'just because I wanted to verify if it was true or not.'" Mother admitted that after returning to the apartment, the boyfriend "'would come and go.'" She said she may have left the children alone with him one time after learning of the allegations. Mother denied seeing the boyfriend physically abuse the children.

5

Mother initially denied any domestic violence, but said, "'He did grab me a couple times . . . probably two or three times.'"

The police report reflected that a physician's assistant at the hospital reported that Z.R. "disclosed being sodomized on multiple occasions and it hurting." The social worker opined: "It is also clear the mother . . . knew or reasonably should have known about the ongoing sexual abuse imposed on the minor, as there were multiple indications [Z.R.] was being targeted by [the boyfriend]. It appears [mother] is using denial as a defense mechanism to eradicate all responsibility of being a protective parent, despite being given the opportunity to safely maintain the children with a safety plan." The social worker further noted: "A safety plan was created with the mother, but the mother failed to follow the plan. With provision[] of these services, it was not possible to maintain the child in the home. Due to the serious nature of the abuse suffered, there was no way to ensure the children's safety short of removal." The caregiver reported mother had three supervised visits with the children; the visits were appropriate; the children enjoyed their mother's presence.

On April 19, 2021, personnel from the department amended the juvenile dependency petitions as to mother to add allegations that mother engaged in acts of domestic violence with the boyfriend in the children's presence (b-2), and the children were physically abused (b-3). On May 17, 2021, they amended to the petition to allege mother also engaged in domestic violence with father.

In the May 18, 2021, addendum report, the social worker noted that the boyfriend had been arrested outside mother's residence on April 21, 2021. Mother said she had no

idea how he knew where she was living. She obtained a temporary restraining order against him on April 23, 2021. Mother called the police when he arrived at her home. Mother disclosed that the boyfriend would punch, hit, and grab the children; she said he would punish them by leaving them in the garage for hours.

The boyfriend reported that mother told him to leave the house when he arrived; she then helped him pay for a hotel. Mother told him that maybe she would allow him to see his baby girl in the future. Mother would not initiate text exchanges with him, but she would respond to his. They would talk about the baby; she sent him 3D ultrasound pictures of the baby.

In an additional information for the court filed June 11, 2021, the social worker noted that mother had completed seven of eight individual therapy sessions and seven of 12 sessions of parenting and domestic violence classes. Mother's therapist indicated mother was doing well as "she is cooperative . . . and has identified she has made bad choices with partners." In the July 22, 2021, additional information for the court, the social worker noted that "the children have expressed having high hopes of returning home with the mother." The children continued to disclose additional acts of abuse including the boyfriend showing D.R. pornographic videos. Z.R. reported he showed her videos of parents killing their children, in mother's presence.

At the July 22, 2021, hearing, mother submitted on jurisdiction. The court found the allegations in the petitions true.

The court held a contested hearing on disposition; mother contested the recommendation that she not receive reunification services. A psychologist testified that

7

mother had the ability to thrive and benefit from therapy. He testified that although she had facilitated the abuse, "with the assistance of treatment, she would be able to protect her children further going forward."

Mother's therapist testified: "I do believe that she has gained knowledge and understanding and would not get involved in a relationship with somebody who is consuming excessive alcohol and other behavior that would be dangerous to her or the children."

Mother testified that she could and would protect her children. She had weekly, two-hour visitation with the children and never missed a visit. The children would tell her how much they miss her. They would tell her they love her and want to be with her. She was six months pregnant with the boyfriend's child; she believed he should be able to see his child.

The court found that mother "knew of both the physical abuse and the sexual abuse. . . . Mother gave her actual or implied consent for both sexual abuse and severe physical harm—and that was severe sexual abuse—to occur on an ongoing basis. [¶] . . . [¶] . . . Mother actually consented and knew the physical abuse was going on. Mother had to have seen the bruises on her children. [¶] . . . There's no question in this Court's mind that Mother actually, or at the very least, impliedly consented to this ongoing sexual abuse at a minimum of five days a week with respect to going to her car and facilitated . . . sexual abuse by handing her daughter the keys and the Vaseline every afternoon [the boyfriend] got home." The court removed the children and denied mother reunification services pursuant to section 361.5, subdivision (b)(6).

Mother's counsel filed a notice of appeal. Mother's appellate counsel filed a brief pursuant to *In re Sade C.* (1996) 13 Cal.4th 952, requesting this court exercise its discretion to independently review the record for error. We offered mother the opportunity to file a supplemental brief, which she did not do. We declined to exercise our discretion to independently review the record and dismissed the appeal as abandoned. (See *CFS v. V.B.* (Oct. 19, 2021, E077511).)

In the January 19, 2022, status review report, the social worker recommended the court set the section 366.26 hearing with adoption as the permanent plan.[3] The children had been placed with I.C., whose home was approved on July 8, 2021. The children informed the social worker "that they feel comfortable in [the] current home, and they choose adoption over legal guardianship with [the] current caregivers." The social worker observed that the children "appeared to have a close relationship with their caregivers. The children were informed and understand that they are not going to reunify with their mother, and they are in agreement with the permanent plan of adoption with [the] current caregiver whom they call '*tia-mama*' [aunty-mama].'" Mother had supervised visitation with the children every other week for two hours. The children reported that they enjoyed seeing mother.

At the hearing on January 24, 2022, mother's counsel noted: "I'm not objecting to the setting of a .26." The court terminated father's reunification services and set the section 366.26 hearing.

___

[3] The court had granted father reunification services at the disposition hearing.

9

In the May 24, 2022, section 366.26 report, the social worker noted that the children had been in the care of the maternal great aunt (I.C.) and uncle since March 30, 2021. The children "report feeling safe in the home and have expressed their desire to be adopted by the applicants." The maternal great cousin (F.C.) and I.C. planned to adopt the children together. The prospective adoptive parents reported that "the children have improved since placement; however, [Z.R.] will occasionally demonstrate dysregulated behaviors." The prospective adoptive parents "have demonstrated their ability to meet the children's emotional needs by providing transportation to their services as needed. The [social worker] observed them to demonstrate an ability to communicate with the children to meet their needs and demonstrate emotional support as needed. [¶] . . . [¶] . . . This placement allows the children to be raised in the same home as their younger sibling . . . , who is also under the plan of adoption with the applicants."[4]

The report also noted: "There is a mutual attachment between the children and the adults in the home. They report they are bonded with the children. The children appear to understand the concept of adoption and report they are in agreement with the plan of adoption. They demonstrate that they recognize the caregivers as their parental figures. They refer to [F.C.] as 'mom.'" This placement allows for all three siblings to be raised together. The children are "very gentle and loving" with their younger sibling and have a "positive sibling relationship." F.C. said, "'They are my children. I love them.' When

---

[4] The younger sibling (born Aug. 2021) had been placed with the prospective adoptive parents and siblings on release from the hospital. (*In re E.B.* (Nov. 3, 2022, E078811) [nonpub. opn.].) On April 8, 2022, the juvenile court terminated mother's parental rights as to the younger sibling. (*Ibid.*) We affirmed the judgment. (*Ibid.*)

asked why they want to adopt, the adoptive parents indicated that they love the children and 'they are part of our family.'"

The children "seemed to be securely attached and lovingly bonded with their adoptive parents." The social worker observed the children "demonstrate appropriate affection toward the adults in the home." "They expressed their beliefs that the children need a caring, competent and loving family, which they believe they are. Both parents also expressed their desire to do all they can to provide the children with permanency and stability. They stated they fully understand the legal and financial rights and responsibilities that accompany adoption."

At the hearing on May 24, 2022, to set the contested section 366.26 hearing, the court noted, "there's very little information on the visits between—visits for the children . . . ." In a July 5, 2022, additional information for the court, the social worker reported she had supervised a visit between mother and the children. Mother brought food and cards to play with the children. The social worker "explained [to] both children the difference between adoption and legal guardianship." She informed the children that "if they are adopted a new birth certificate will be issued by the Court and parental rights will be terminated. Children were informed that once [the] Court terminates parents' rights, there will be no more visits, unless the caregiver allows it. Both children stated that they want to be adopted; [Z.R.] stated that she does not feel safe around her mother, 'even on visits. . . . I want [F.C.] to be close to me . . . she makes me feel safe." D.R. said, "'I'm afraid that my mom is going to find another boyfriend and the same thing is going to happen again. . . . I don't want to go through pain again.'"

11

At the section 366.26 hearing on July 5, 2022, mother's counsel indicated he did not plan on calling the social worker to testify. Mother testified the children call her, "Mom or Mommy in Spanish." Z.R. had never expressed any fear of being around her. The children hug her during visits. The children are very comfortable around her. She is very close to them. During their lives together, they were very close. Mother believed she could offer the children guidance, support, and someone to trust. Mother wanted the children in a legal guardianship so that she could have "ongoing input in their lives and visitation and parental rights as the biological mother." The parties stipulated that mother lived with D.R. and Z.R. for nine and 11 years, respectively.

Mother conceded that the children did not trust her and their relationship has diminished since removal. "I want to be able to regain that trust and show them that things—that I've changed that things are different." The children never expressed to her that they wanted to be adopted. If she, herself, heard the children say that they want to be adopted, then she would "give them that."

Mother introduced into evidence several photographs of her and the children from a visit in which the children are smiling. The department noted: "I don't think they're relevant, but they're just photographs, so I won't object." Minor's counsel argued: "The fact Mother's Counsel has produced selfies proves little and can be explained away as the children not wanting to hurt the mother's feelings by taking these photos with her." Mother "takes the place of a friendly visitor, a mere gift-giver, someone who takes selfies with the children. And on its face, that's not someone who takes the role of the mother." The department noted: "Counsel talks about the pictures that were presented and how

12

they have . . . nice, fun time at visits. Of course, they do. She's bringing them gifts. She's bringing toys. She brings games. There's nothing to not like. But if you look at the statement from the children, it's only because the caregiver's there. If she wasn't there, the safety goes out the window. Every visit with Mom has been supervised for that reason. Safety only occurred with the caregiver and not with Mom alone."

Mother's counsel argued: "There are photos that we've presented which not only display apparent happiness—sure, they're having a good time, but they're also with their mother—and a closeness. They're sitting on her lap. They are not afraid. And all of a sudden, in the last minute social worker visit, we have that the children are afraid, and they want to be adopted very bluntly." "The pictures, again, refute any element of fear."

The court believed the social worker's statements that Z.R. and D.R. experienced anxiety when visiting with mother and wanted to be adopted. The court discussed *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). The court found: "In this case, I'll note that [mother] has had regular visitation and contact with the children, but there's been insufficient evidence that there's a positive, emotional attachment between the children and [mother] such that it would—it would be detrimental to the children to terminate parental rights. There's been no evidence presented that either [of the children] demonstrate emotional dysregulation after the visits, that they are inconsolable or emotionally upset upon leaving the visits with their mother. The visits do appear to go well, and [mother] did testify as to her relationship with the children, and the children did have a significant period of time in their lives when they lived with their mother."

13

The court continued: "However, . . . both children . . . have indicated that they feel safer with their caregiver, and both children have expressed a desire to be adopted by the caregiver. The Court is finding that [mother] has not met the burden of proof as to establishing the three elements necessary under . . . *Caden C.* for the Court to deviate from the legislative preference for adoption." The court terminated mother's parental rights.

## II. DISCUSSION

Mother contends the court erred in declining to apply the beneficial parental relationship exception to the termination of her parental rights. We disagree.

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)

14

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) It is the parent who must prove all three elements by a preponderance of the evidence; the parent must "show a '*compelling* reason for determining that termination would be detrimental to the child . . . .'" (*Id.* at p. 635.)

Here, the court found that mother had met the first prong of the beneficial parental relationship exception: mother "has had regular visitation and contact with the children." Thus, we address only the second and third prongs, beneficial relationship, and detriment.

### A.    *Beneficial Relationship*

On the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Courts "assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between

15

parent and child, and the child's particular needs.'" (*Id.* at p. 632.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child . . . ." (*Ibid.*)

We review whether there is a beneficial relationship for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) "[I]n assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Id.* at p. 640.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' [Citations.] Uncontradicted testimony rejected by the trial court '"cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved."'" (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

16

Substantial evidence supported the court's finding that the children did not have a beneficial relationship with mother. Here, mother had the burden of proving each child had "a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The court properly considered the length of time the children had previously been in mother's care and their relationship with mother. However, the court believed the reports that both children repeatedly stated they wanted to be adopted, even if that meant they might not be able to visit with mother ever again.

Z.R. stated that she did not feel safe around her mother even on visits. D.R. said, "'I'm afraid that my mom is going to find another boyfriend and the same thing is going to happen again. . . . I don't want to go through pain again.'" The court made a factual finding that the children's statements were true. Indeed, both children had experienced extensive abuse while in mother's care. As the court noted that there was no evidence presented that the children experienced any emotional issues when visits with mother were over. Sufficient evidence supported the court's determination that mother failed her burden of proving that the children had a substantial, positive, emotional attachment to mother such that the child would benefit from continuing the relationship.

Mother contends the exhibits reflect that the children were not afraid of mother; they were willing to hug and sit in her lap; they both were smiling. Even so, one set of pictures from one day during a supervised visit does not establish a beneficial relationship.

Mother could have, but did not, request a bonding study, which may have helped her establish an evidentiary basis for determining there was such a bond. (*Caden C.*,

17

*supra*, 11 Cal.5th at p. 633, fn. 4 ["courts should seriously consider, *where requested* . . . , allowing for a bonding study"], italics added.) Moreover, mother could have requested the case logs, requested more detailed reports regarding the nature of the visits, and requested the social worker and caregivers testify at the section 366.26 hearing about the quality of visits. (*In re Mary C.* (2020) 48 Cal.App.5th 793, 801 [By failing to object in the juvenile court to specific defects in the reports, parents forfeit any challenge to them on appeal.].) Here, mother failed her burden of establishing a beneficial bond such that the court's order was supported by substantial evidence.

### B. Detriment

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion."  (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."'"  [Citation.]  But ""[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.""""  (*Id.* at p. 641.)

The court acted within its discretion in finding that termination of mother's parental rights would not be detrimental to the child.  Here, as discussed *ante*, mother failed to establish a beneficial relationship between her and the children.

On the other hand, the children had spent approximately 15 months in the care of the prospective adoptive parents.  The social worker observed that the children "appeared to have a close relationship with their caregivers."  "There is a mutual attachment between the children and the adults in the home.  They report they are bonded with the children."  The children referred to F.C. as "'mom,'" and she said, "'They are my children.  I love them.'"  "When asked why they want to adopt, the adoptive parents indicate that they love the children and 'they are part of our family.'"  The children repeatedly expressed a desire to be adopted by the prospective adoptive parents.  The placement allowed the children to be raised in the same home as their younger sibling, with whom the children had a "positive sibling relationship."

Mother failed to make a compelling showing that the loss of the children's relationship with her would harm them to an extent not outweighed, on balance, by the security of a new, adoptive home with their prospective adoptive parents. Thus, the court acted within its discretion in determining the circumstances were not exceptional, such that the termination of mother's parental rights would not be detrimental to the children.

## III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                    J.

We concur:


RAMIREZ
                P. J.


FIELDS
                J.

20